**In re Ethel T. WEST.**

**No. 4:02–bk–23841.**

United States Bankruptcy Court,
E.D. Arkansas,
Little Rock Division.

Jan. 9, 2009.

Ethel T. West, pro se.

Jean M. Madden, Madden Law Firm, Little Rock, AR, for Debtor.

## AMENDED MEMORANDUM OPINION AND ORDER DISGORGING FEES

AUDREY R. EVANS, Chief Judge.

On January 29, 2008, a hearing was held on Ms. Ethel West's *Motion to Disgorge Fees*, filed *pro se* on December 19, 2007, and the Court's *Order to Show Cause and Notice of Hearing*, entered on January 4, 2008 ("**Order to Show Cause**"). Joe Kolb appeared on behalf of Ms. Madden, who was also present, and Ms. West appeared on her own behalf. Joyce Bradley Babin, the Chapter 13 Trustee (the "**Trustee**"), also appeared. At the close of the hearing, the Court took the matter under advisement. This Amended Memorandum Opinion is entered to correct the numbering of certain footnotes.

### INTRODUCTION

In late 2002, Ms. West, a single mother of two children, hired Ms. Madden to represent her in filing bankruptcy. As Ms. West was nearing completion of her 60–month plan in Fall 2007, she received a letter from the Trustee's office informing her that she still owed her mortgage creditor, Regions Mortgage Inc. ("**Regions**"), an arrearage for past due monthly mortgage payments on her home. Because Ms. West never missed a Chapter 13 plan payment from the time she filed bankruptcy in December 2002 until her plan was completed 60 months later, and because she believed her ongoing mortgage payment and an arrearage payment were being paid to Regions through her plan, Ms. West did not think she was behind on her mortgage.

Upon receiving the Trustee's letter, Ms. West initially contacted the Madden Law Firm in hopes that her attorney would be able to explain to her the basis for the arrearage described in the Trustee's letter. Ms. West received no explanation and filed her *Objection to Allowance of Claim* ("**Objection**") *pro se* on September 20, 2007, in which she disputed that she owed Regions an arrearage and claimed that her representation by the Madden Law Firm was inadequate.

At the hearing on Ms. West's Objection held December 6, 2007 (the "**Objection Hearing**"), Ms. West and Regions reached a settlement regarding the arrearage owed to Regions. Ms. West gave testimony in support of her allegations of inadequate representation, testifying to an overall lack of communication from her attorneys at the Madden Law Firm. Ms. West also specifically stated that in two instances, her attorneys failed to follow her directions and agreed to settlements without her consent. Ms. West specifically requested that she be refunded at least half of the attorney's fees that she paid to Ms. Madden. Even though Ms. Madden knew that Ms. West's Objection was set for hearing on December 6, 2007, and that in the Objection, Ms. West accused Ms. Madden of inadequate representation, Ms. Madden did not appear to defend these allegations and she did not inform the attorney she sent to represent Ms. West about the allegations. Because the attorney representing Ms. West was not prepared for the hearing, the Court did not rule on Ms. West's requests that Ms. Madden return attorneys fees, but instead provided Ms. Madden another opportunity to address the accusations against her.[1] To give Ms. Madden that second opportunity, the Court entered its Order to Show Cause on January 4, 2008, ordering Jean M. Madden to personally appear and show cause why she should not be sanctioned and/or required to disgorge all or part of the fees paid to the Madden Law Firm by Ms. West. The Order to Show Cause attached the transcript of the Objection Hearing to further inform Ms. Madden of the serious accusations against her.

Meanwhile, on December 19, 2007, Ms. West filed a letter *pro se* formalizing her fee request made at the Objection Hearing but requesting that *all* of Ms. Madden's attorney's fees be disgorged. This letter was docketed as a *Motion to Disgorge Fees* ("**Motion to Disgorge**") and set for hearing on January 29, 2008 along with the Court's Order to Show Cause.

At the January 29, 2008 hearing (the "**OSC Hearing**"), the Court stated that while Ms. West had already put on her evidence with respect to the allegations against Ms. Madden and the Madden Law Firm, the current hearing was Ms. Madden's opportunity to put on her evidence. When Ms. Madden appeared for the OSC Hearing, she knew without doubt that the issue before the Court was whether she had adequately represented Ms. West. Despite this "second chance," to defend (having defaulted at the hearing set on the Objection), Ms. Madden failed to offer convincing proof that she had, in fact, provided Ms. West adequate legal representation. Given the complexity of this Chapter 13, the Court notes the burden placed on Ms. West to understand her case, cross-examine her own attorney (someone who has filed thousands of bankruptcy cases

---

1. Ms. Madden failed to appear and no evidence was introduced to rebut Ms. West's testimony. Under these circumstances, the Court would normally grant Ms. West's motion on all issues pertaining to attorney representation. However, given the serious nature of Ms. West's allegations, the Court, using its discretion, continued the hearing to allow Ms. Madden another chance to provide evidence.

and hired competent counsel to represent her), and put on her evidence *pro se.* Taking into consideration all testimony and evidence presented at both the Objection Hearing and the OSC Hearing, the Court finds that Ms. Madden failed to provide adequate representation to Ms. West, and that Ms. Madden's inadequate representation harmed Ms. West, preventing her from receiving the benefits from her Chapter 13 bankruptcy that she would have received if she had been adequately represented. For the reasons set forth in more detail herein, the Court finds that Ms. West's Motion to Disgorge should be granted and all fees paid to Ms. Madden should be returned to Ms. West.

## FACTS

Ms. West alleges that her representation by Ms. Madden and the Madden Law Firm is inadequate based on an overall failure or unwillingness to communicate. Specifically, Ms. West objects to certain fees charged by Ms. Madden, Ms. Madden's handling of an objection filed by Malco, and Ms. Madden's handling of the arrearage asserted by Regions near the close of Ms. West's plan. The following facts are taken from the record of this bankruptcy case and the testimony and evidence introduced at the Objection Hearing and the OSC Hearing.

### Ms. West's Petition and Chapter 13 Plan

On October 29, 2002, Ms. West signed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code and her *Chapter 13 Narrative Statement of Plan* ("**Initial Chapter 13 Plan**").[2] In her petition, Ms. West scheduled $4,946.50 in unsecured debt,[3] and $6,500 in secured debt on her vehicle, a Ford Taurus (which was listed as having a value of $6,500). Ms. West's schedules listed $54,519.00 in total assets including her home which she valued at $45,000. No debt was listed in association with the home, and instead, a notation indicated that the debt was in the name of Ray A. West, but that Ms. West was making the payments. For the nine years prior to filing bankruptcy, Ms. West was employed as a Nurse's Tech at Arkansas Children's Hospital where she continued to be employed throughout her five-year plan.

▮▮▮ The Debtor proposed a sixty month plan.[4] Ms. West proposed to pay her mortgage creditor, Regions, outside the plan because at the time she signed her Initial Chapter 13 Plan in late October

---

2. The Court takes judicial notice of any document that is filed of record in Ms. West's bankruptcy case and is subsequently mentioned in this Opinion. *See* FED.R.EVID. 201; *In re Henderson*, 197 B.R. 147, 156 (Bankr. N.D.Ala.1996) ("The court may take judicial notice of its own orders and of records in a case before the court, and of documents filed in another court.") (citations omitted); *see also In re Penny*, 243 B.R. 720, 723 n. 2 (Bankr.W.D.Ark.2000).

3. Ms. West's unsecured debt consisted of $300 owed to the Texas Guaranteed Student Loan Corporation, and $4,646.50 owed to Volkswagon Credit, Inc. (Ms. West was a co-debtor on the Volkswagon debt).

4. At the time Debtor filed her petition and plan, the Bankruptcy Code provided that a Chapter 13 plan may not provide for payments for a period longer than three years, unless the Court, upon a finding of cause, approves a longer period not to exceed five years. 11 U.S.C. § 1322(d) (BAPCPA amended this section to provide the same rule for below-median income debtors, and a strict five year limitation for above-median income debtors). Further, the Court cannot approve a modification to the plan that allows it to extend for a period longer than five years. 11 U.S.C. § 1329(c). *See also In re Cutillo*, 181 B.R. 13, 16 (Bankr.N.D.N.Y.1995).

2002, she was current on her mortgage.[5] Ms. West's Initial Chapter 13 Plan proposed to pay secured creditor Malco Motors, Inc. ("**Malco**") $6,500 (the amount that Ms. West's schedules listed as both the value of the collateral and the amount of the debt) at an interest rate of 9%. On December 2, 2002, more than a month after Ms. West signed her petition, Ms. Madden filed the petition and Initial Chapter 13 Plan. Ms. West's plan was modified in March 2004, as described in more detail below, to bring her mortgage payment inside the plan and to pay Regions a post-petition arrearage of $3,894.26 at $109 per month.

### The Malco Objection and Agreed Order

On January 2, 2003, Malco filed an *Objection to Confirmation of Plan*, claiming that Ms. West's Initial Chapter 13 Plan did not adequately protect Malco's collateral (the "**Malco Objection**"). The collateral (a 1997 Ford Taurus) was listed at $6,500 in Ms. West's schedules. Malco filed a claim on February 6, 2003, listing the debt and value of the vehicle as $8,519.94. On February 18, 2003, the Court entered an agreed *Order Withdrawing Objection to Confirmation Upon Condition* (the "**Malco Agreed Order**") signed by Ms. Madden, in her capacity as Ms. West's attorney. In the Malco Agreed Order, Malco agreed to withdraw its objection upon the condition that Ms. West would modify her plan to "provide that the secured value of the subject 1997 Ford Taurus is $7,500.00 to be paid in equal payments over the life of the plan." The Malco Agreed Order also pro-

vided that Ms. West would "make full and timely planned [sic] payments and [would] be subject to strict compliance for a period of nine (9) months from the date of the entry of this order.... Should the Debtor fail to abide by the terms of this order, Creditor is entitled to ex parte relief from stay." On March 3, 2003, Ms. West's Chapter 13 plan was modified in accordance with the Malco Agreed Order to reflect a $7,500 value for the Ford Taurus, and to pay Malco $159.35 per month with 10% annual interest.

At the Objection Hearing, Ms. West testified that her initial problem with the Madden Law Firm arose after Malco filed its objection to her Initial Chapter 13 Plan. Ms. West testified that John Jackson of the Madden Law Firm[6] contacted her regarding the Malco Objection, and she informed him that she "would rather give the car up than pay" the additional $2,000.00 that Malco was requesting. Ms. West testified that although Mr. Jackson indicated he understood her position, she later received a paper saying she would pay the additional $2,000.00 despite her instructions to the contrary.

In response to Ms. West's allegations regarding the Malco Objection and Malco Agreed Order, Ms. Madden explained: "[t]here's nothing in the file to indicate that [Ms. West] would object. And I would never have agreed to it without her telling me it would be okay." However, Ms. West continued to contend at the OSC Hearing that when Mr. Jackson contacted her regarding the Malco Objection (stating that Malco was demanding to be paid more

---

5. When a debtor opts to make his or her monthly mortgage payments directly to the creditor rather than through a Chapter 13 plan, it is commonly referred to as "outside the plan." Payments provided for in the plan and made directly by the Chapter 13 trustee are referred to as "inside the plan."

6. According to Ms. Madden's testimony at the OSC Hearing, Mr. Jackson resigned from the Madden Law Firm shortly before the OSC Hearing. Furthermore, Mr. Jackson was not present at either the Objection Hearing or the OSC Hearing despite his personal knowledge of Ms. West's bankruptcy case.

than $8,500 for the car), she informed him that she "did not want to pay $9,000 for a $6,000 car." Ms. West testified that the blue book value for her car was $5,000, and prior to filing bankruptcy, Ms. West had already paid $2,000 on the car. Ms. West explained that she would rather let Malco have the car back than pay $7,000 to keep it, but her attorneys did not present that option to her. Consistent with her testimony at the Objection Hearings, Ms. West claimed that she told Mr. Jackson that she did not want to pay the $7,000 but the Madden Law Firm signed the Malco Agreed Order anyway. The Court finds Ms. West's testimony to be legally sound and factually credible, and concludes that the Malco Objection was settled without Ms. West's authority.

### Regions' Arrearages, Motion for Relief, and Proofs of Claim

Shortly after Ms. West's plan was modified to satisfy Malco, Regions filed a proof of claim (the "Original Claim") on March 10, 2003, claiming that it was owed a pre-petition arrearage of $1,183.31, which included $206.05 in interest on pre-petition arrears and $889.76 in monthly mortgage payments for the months of November 2002 and December 2002. Based on Regions' Original Claim, Ms. West was not current on her mortgage at the time that Ms. Madden filed her bankruptcy petition (although Ms. West was current on her mortgage payments when she signed her petition and Initial Chapter 13 Plan in October 2002). However, neither Regions nor Ms. Madden took any action to have the pre-petition arrearages owed to Regions paid through Ms. West's Initial Chapter 13 Plan *or* by Ms. West outside her plan. Thus, Ms. West's Chapter 13 plan (as modified on March 3, 2003, to

satisfy Malco) was confirmed on June 16, 2003, without providing for the pre-petition arrearage Regions claimed on its Original Claim.

On January 16, 2004, Regions filed a *Motion for Relief from Automatic Stay* (the "**Motion for Relief**") claiming that Ms. West had fallen behind in her mortgage payments to Regions post-petition, and that the earliest unpaid payment was the August 1, 2003 mortgage payment.[7] An *Agreed Order Settling Motion For Relief* (the "**Regions Agreed Order**") was entered on March 18, 2004, which withdrew Regions' Motion for Relief upon the following conditions:

1. The Motion for Relief is withdrawn on the condition that Ms. West has 20 days to file a modification to bring into the plan the on-going payments of $426.34 per month and the *post-petition* arrearage of $3,894.26 to be cured within 36 months from the entry of this order at $109 per month.

2. The Movant is entitled to its fees and costs of $500.00 incurred in filing this action.

(Emphasis added.) According to the *Agreed Order Settling Objection to Claim filed by Debtor Ethel T. West,* entered on December 21, 2007, the $3,894.26 in post-petition arrearages provided for in the Regions Agreed Order included the $500.00 in attorney's fees that were already provided for in the Regions Agreed Order. Thus, Ms. West had actually only accrued $3,394.26 in post-petition *mortgage* arrearages at the time the Regions Agreed Order was entered.

Pursuant to the Regions Agreed Order, Ms. West modified her Chapter 13 plan on March 26, 2004 (the "**March 2004 Modi-**

---

7. No one testified as to why Ms. West failed to make these mortgage payments yet continued to make her Chapter 13 plan payments.

fied **Plan**"), to provide for the regular monthly mortgage payment of $426.34 to be paid inside the plan (that is, directly by the Trustee). The March 2004 Modified Plan further provided for Regions to be paid the post-petition arrearage and attorney's fees of $3,894.26 inside the plan to be cured at $109.00 per month. (Ms. West's plan was never specifically modified to provide for the payment of the $1,183.31 prepetition arrearage that Regions claimed on its Original Claim although the March 2004 Modified Plan may have resulted in some of that arrearage being paid.) Ms. West's plan, as modified in March 2004 and in April 2004 (to satisfy another objection by Malco), was confirmed on May 28, 2004.

On August 11, 2004, Regions amended its Original Claim to include the $500.00 in attorney's fees provided for in the Regions Agreed Order in addition to the $1,183.31 pre-petition arrearage, resulting in a total arrearage claim of $1,683.31 (the **"First Amended Claim"**). Regions failed to include in the First Amended Claim the total $3,894.26 in post-petition arrearages and attorneys' fees provided for in the Regions Agreed Order. This caused the Trustee's office to show that Regions was owed a total arrearage of $1,683.31 when in reality Regions' records reflected the total arrearage to be $5,077.57 ($1,183.31 in pre-petition arrearages *plus* $3,894.26 in post-petition arrearages and attorney's fees provided for in the Regions Agreed Order). The March 2004 Modified Plan increased Ms. West's plan payments from $171.20 bi-weekly for the life of the plan to $394.41 bi-weekly for the life of the plan.

### The September 2004 Modified Plan

Soon after Regions filed its First Amended Claim which failed to include the post-petition arrearage that Ms. West had

agreed to pay, Ms. West's Chapter 13 plan was modified once again on September 1, 2004 (the **"September 2004 Modified Plan"**), to reflect a change in Ms. West's budget. Ms. West explained that after informing Mr. Jackson that her son had turned 18 and that the child support payments that she had been receiving for her son had ceased, Mr. Jackson informed her that she could modify her plan to reflect the reduction in income. (It is clear from this testimony that Ms. West was not given legal advice about the adverse consequences of this modification. Nor was Ms. West given any advice about the consequences of Regions' failure to file a proper claim). The September 2004 Modified Plan was confirmed on October 1, 2004, and lowered Ms. West's bi-weekly plan payment from $394.41 to $329.70.[8]

### The Status Letter

According to a Case Overview prepared by the Trustee's office (the **"Case Overview"**) (Trustee's Exhibit 2), Ms. West never missed a Chapter 13 plan payment from the time that she filed bankruptcy in December 2002. However, just before Ms. West was to complete her plan, correspondence between the Trustee and Regions revealed a remaining arrearage owed to Regions. Specifically, on September 5, 2007, the Trustee faxed a questionnaire to Regions (the **"Status Request"**). The Status Request required Regions to provide the Trustee's office with detailed information about the amount needed, if any, to bring Ms. West's mortgage loan current. The Trustee's office received a response from Regions to the Status Request on September 5, 2007 (the **"Status Response"**), which stated that Ms. West still owed Regions $4,511.80 for past-due monthly mortgage payments plus $413.71

---

8.  Other fluctuations in Ms. West's plan payments are not detailed in this Opinion but are

listed on the Trustee's Case Overview (Trustee's Exhibit 2).

in attorney's fees. On September 6, 2007, the Trustee's office forwarded the Status Response to Ms. West and Ms. Madden along with a letter specifically stating that if Ms. West did not contact the Trustee's office by October 8, 2007, the Trustee would make an adjustment in order to pay Regions the $4,511.80 arrearage it claimed it was owed in the Status Response (the "**Status Letter**") (Madden's Exhibit 13).[9]

On September 6, 2007, the same day the Trustee's office mailed the Status Letter to Ms. West and Ms. Madden, Regions amended its claim for a second time (the "**Second Amended Claim**") to provide for arrearages in the sum of $5,577.57. The $5,577.57 in arrearages included the $1,183.31 in pre-petition arrearages from Regions' Original Claim, plus the $3,894.26 in post-petition arrearages provided for in the Regions Agreed Order, plus the $500.00 in attorney's fees provided for in the Regions Agreed Order.[10] On September 18, 2007, the Trustee entered a *Summary Notice of Amended Claim Filed*, which notified Ms. West and Ms. Madden of Regions' Second Amended Claim and provided Ms. West an opportunity to object to the claim. No explanation was provided as to why Ms. Madden did not object to Regions' Second Amended Claim on behalf of Ms. West. Further, based on both Ms. West's and Ms. Madden's testimony, Ms. Madden did not discuss with Ms. West the possibility of objecting to Regions claim.

Between August 11, 2004 (the date Regions filed its First Amended Claim), and September 5, 2007 (the date the Trustee

received the Status Response), the Trustee's office had administered Ms. West's plan under the assumption that Regions was owed a total arrearage of $1,683.31 to be cured at $109.00 per month, and according to the Case Overview, by August 31, 2007, the Trustee's office had paid Regions $1,410.10 of the $1,683.31 that was owed. Thus, it was not until Ms. West was four months from completing her 60 month plan that Regions finally made the Trustee's office aware that it was actually owed over $5,000.00 in total arrearages by sending the Status Response and by filing its Second Amended Claim.

Ms. West contacted the Madden Law Firm upon receipt of the Status Letter to find out why the letter said she owed Regions an arrearage. Ms. West claimed that "after several ... phone calls" to the Madden Law Firm, she was unable to obtain an explanation. Ms. West testified that one of Ms. Madden's legal assistants told her that the Madden Law Firm did not make payments, that it was Ms. Babin's office that made payments, and Ms. West should contact Ms. Babin's office. Ms. West further testified that she continued to call the Madden Law Firm "just about every day," but "nobody even bothered to call me back." Ms. West did admit that "every now and then" she could reach Mr. Jackson. Furthermore, Ms. West said that she went to the Madden Law Firm, but "[n]o one ever saw me." Ms. West explained that she felt "as though I didn't even exist."

---

9. Although the Status Letter stated that the Trustee would make an adjustment to pay the additional amount needed to bring Ms. West's mortgage loan current, this would have been impossible given the proximity to the end of Ms. West's sixty month plan; the plan could not have been modified to extend beyond 60 months, and there were only two or three

months remaining in her plan in which she would be required to pay over $5,000 to bring the loan current.

10. When Regions filed its Second Amended Claim, it included an extra $500.00 in attorney's fees. Regions was actually owed only $5,077.57 in total arrearages.

Ms. Madden explained that following her receipt of the Status Letter on September 8, 2007, both she and Mr. Jackson looked into Ms. West's file because neither one of them understood how Ms. West could owe Regions such a large arrearage. Ms. Madden then drafted a memo to her staff on September 12, 2007 (the **"Staff Memo"**), to instruct them to get more information from the Trustee as to why Regions' Second Amended Claim "wasn't set up on the Trustee computer." (Madden's Exhibit 15.) The Court notes that all the information needed to ascertain how this problem arose could be found upon a careful review of Ms. West's file, or the ECF docket and claims registrar.

On September 13, 2007, Ms. West called the Madden Law Firm and spoke to Mr. Jackson. Ms. West testified that she was allowed to speak to Mr. Jackson after she told one of Ms. Madden's legal assistants that, "I was fed up, and ... I was going to write the Court to find out what I could do to get some answers, because I wasn't getting any from them." During the September 13, 2007 conversation with Mr. Jackson, Ms. West told him that she thought she was paying the arrearages owed to Regions because her plan payment increased from $171.20 per month to $394.41 per month in May 2004 following the confirmation of the March 2004 Modified Plan. Ms. West testified that she asked Mr. Jackson how she could owe this amount when she was already paying the arrearages owed to Regions through her plan payments; Ms. West testified that Mr. Jackson said he did not know. Ms. West testified that she told Mr. Jackson that she could not pay Regions an additional $4,000.00 when no one knew why she was paying it. Ms. West testified that Mr. Jackson told her that he would look into the matter and call her back at the end of the day to explain what was going on.

Ms. Madden testified that one of her legal assistants spoke to the Trustee's office on September 18, 2007, and based on the handwritten notes on the Staff Memo, Ms. Madden believes her assistant then attempted to call Ms. West. Mr. Jackson also e-mailed Regions' counsel, Mr. Dyke, asking him to investigate how Regions could be owed such a large arrearage when Ms. West had never missed a Chapter 13 plan payment. (Madden's Exhibit 16.) Ultimately, McCalla Raymer, LLC, outside counsel for Regions, e-mailed a response to the Madden Law Firm on September 18, 2007, explaining that Regions failed to properly amend its claim following the entry of the Regions Agreed Order. (Madden's Exhibit 17.)

Ms. Madden acknowledged receiving messages from Ms. West on September 18, 2007, and September 19, 2007. One of Ms. Madden's legal assistants took a phone call message from Ms. West, which read, "[c]lient wants to object to Arrearage Amount!! Spoke [with] Mr. Jackson about this." (Madden's Exhibit 19.) Ms. Madden testified that she interpreted the phone call message to mean that Ms. West wanted the Madden Law Firm to object to the arrearage amount claimed by Regions and that Ms. West had spoken to Mr. Jackson about filing an objection. Ms. Madden testified that although she "personally ... couldn't believe" that Ms. West owed Regions such an arrearage, she could not comply with Ms. West's request by filing an objection, until she "knew what it was about." Then on September 19, 2007, another legal assistant took another phone call message from Ms. West. (Madden's Exhibit 21.) Ms. Madden admitted that as of September 19, 2007, Mr. Jackson had not followed up with Ms. West regarding their September 13, 2007 conversation, although Ms. West had called the office on three occasions. This phone message stated that Ms. West told Mr. Jackson that

she wanted to object to Regions' Second Amended Claim. Furthermore, the phone call message stated that Ms. West "want[ed] to send a certified letter to Judge Evans."

### Ms. West's Objection

Ms. West testified that shortly after speaking to Mr. Jackson on September 13, 2007, she received a letter from the Madden Law Firm informing her that she would pay Regions. In response to this allegation, Ms. Madden testified that she was not aware of any correspondence that had been sent to Ms. West which agreed to pay the arrearage owed to Regions. Ms. Madden further testified that she supposed that Ms. West was referring to the notice that the Trustee entered on September 18, 2007, notifying her of Regions' Second Amended Claim. In any case, Ms. West testified that she then wrote and mailed the Objection to the Court *pro se* because the Madden Law Firm had moved forward without explaining why she still owed Regions a large arrearage even though she made all her plan payments. Ms. West's Objection disputed the alleged arrearage claimed by Regions, and asserted a Complaint against the Madden Law Firm for the way in which her case had been handled. Ms. West's Objection specifically alleged, "I got a letter in the mail today. Sent to me & Regions it says that I will pay the amount. After I asked them 'not' to agree with the amount." Ms. West further alleged, "I paid for a service, and as far as I can tell they (Madden) has not held up to their part."

Ms. Madden testified that on September 20, 2007, the same day that the Objection was filed, she called Mr. Dyke regarding the arrearage owed to Regions, and he explained that Ms. West owed the arrearage, agreed to a minor reduction, but said he needed authority from Regions before agreeing to a final settlement amount. Ms. Madden introduced handwritten notes that she took during the conversation with Mr. Dyke. (Madden's Exhibit 22.) Ms. Madden further testified that after speaking with Mr. Dyke on September 20, 2007, she called Ms. West, and told her that she did in fact owe Regions the full amount but could pay $100 per month in a payment plan. Ms. Madden testified that Ms. West agreed to the settlement. While Ms. Madden introduced notes of her conversation with Mr. Dyke, there are no notes or other documentary evidence of her telephone conversation with Ms. West, and Ms. West did not acknowledge this conversation in her testimony. Further, given the desperation that Ms. West exhibited after this alleged call, the Court finds Ms. Madden's memory that she made this call inaccurate.

Ms. Madden testified that on September 27, 2007, she wrote a letter to Mr. Dyke to confirm the September 20, 2007 agreement with Mr. Dyke that he would provide Ms. Madden with a more detailed explanation of Regions' Second Amended Claim. (Madden's Exhibit 23.) Ms. West was copied on this letter. Also on September 27, 2007, Ms. Madden's legal assistant took another phone message from Ms. West. (Madden's Exhibit 24.) Ms. Madden testified that she believed, based on the handwritten notes in the phone message, that she discussed Ms. West's case with her legal assistant who then called Ms. West back and informed Ms. West that she would be getting a discharge in her bankruptcy case, but that Ms. Madden and Mr. Dyke were "still settling the exact amount" owed to Regions. The Court finds the fact that Ms. Madden had her secretary call Ms. West and inform her that she would be getting a discharge to be unresponsive. Ms. West was inquiring about the arrearage on her home mortgage, not about

whether she would receive a discharge.[11]

More than a month later, on October 30, 2007, Ms. West faxed Ms. Madden requesting that Ms. Madden "ask for more time when we go to court on [November 14, 2007]." (Madden's Exhibit 25.) Ms. Madden interpreted Ms. West's fax as a request "for more time to pay the arrears that she knew that she needed to pay." However, Ms. West testified that she sent the fax to Ms. Madden because of the statement in the Objection Hearing notice, entered September 21, 2007, which read: "[a]ttorneys are directed to contact the Courtroom Deputy at least 2 working days prior to hearing if this matter will require more than 15 minutes to be heard." Ms. West explained that she believed the Objection would require more than 15 minutes to be heard because she needed time "to explain my situation and how I wasn't getting any information or any feedback from" the Madden Law Firm. Ms. West further testified that she called the Court and spoke to the Clerk to ask for more time because the Madden Law Firm did not ask for more time as Ms. West had asked them to.

After Ms. West called the Court to ask for more than 15 minutes, she was personally notified by the Madden Law Firm on November 13, 2007, that the Objection Hearing had been continued from November 14, 2007, until December 6, 2007, due to a noticing problem. However, Ms. Madden testified that on November 13, 2007, Mr. Jackson "spent a considerable amount of time on the phone with [Ms. West] explaining how it was she could owe" Regions such a large arrearage. Ms. Madden provided no documentary evi-

dence of this call and did not call Mr. Jackson to testify.

Ms. West testified that she attended Court on November 14, 2007, despite having been informed of the continuance of her Objection. She stated:

> I just did not believe that we didn't have Court that day.... I didn't entrust [the Madden Law Firm] enough to—well, my future, my home, you know, for my kids, I wanted to come and make sure that they wasn't here, and if I was represented by them I wanted to be here to see what was going on.

After the Objection Hearing was continued from November 14, 2007, until December 6, 2007, Ms. Madden testified that on November 23, 2007, she wrote a letter to Ms. West so she would have something in writing explaining how Ms. West could owe Regions an arrearage (the "**November Letter**"). (Madden's Exhibit 26.) The letter read as follows:

> Dear Ms. West:
>
> Please let me know if you are still willing to cure the remaining mortgage arrearage at $100.00 monthly after your case closes.
>
> You may recall that on March 18, 2004 an Order was entered that we would cure the mortgage arrearage of $3,894.26 over the remaining months of the plan.
>
> A modification was filed on March 26, 2004 that set forth a monthly payment on the mortgage and the mortgage arrearage.
>
> Then on September 2, 2004 **at your request,** another modification was filed to reduce the plan payments. This could be done since creditor Regions

---

11. The Court also notes that the outstanding arrearage on her home would not prevent Ms. West from getting a discharge, as she made all her plan payments, and a mortgage ex-tending beyond the length of a plan is not discharged under 11 U.S.C. § 1328(a)(1) in any case.

had not filed the corrected arrearage proof of claim at that time and the plan payments could be calculated at the original arrearage claim of $1,183.31.

Now that creditor Regions has amended its claim to $5,577.57, the Trustee does not have funds to pay this amount.

You will note that the current claim of $5,577.57 is more than the agreed amount of $3,894.26. Creditor Regions' Attorney has agreed to adjust the claim back to the agreed amount of $3,894.29. When this is done, there will still be a shortage in funds due to the Trustee payment.

Again, I need to know if you will agree to cure the remaining corrected arrearage after the case closes. If so, the case can be closed now and the discharge can be entered.

Sincerely,

Jean M. Madden

(Emphasis in original.) At the Objection Hearing, Ms. West acknowledged receiving this letter, stating, "I received the letter the other day, saying that, ... [the Madden Law Firm] had talked to Regions' lawyers and said that we could reach [an] agreement out of Court for $100.00, which is what we [12] agreed to." Despite these communications, Ms. West stressed that she never received an explanation from Ms. Madden or the Madden Law Firm as to why she might still owe Regions an arrearage.

Ms. Madden explained that she believed the Objection was settled prior to the Objection Hearing based on the negotiations that had been taking place leading up to the hearing except that Mr. Dyke had not yet agreed to a final settlement amount to be paid to Regions. Furthermore, Ms. Madden testified that Mr. Dyke informed her that he preferred "the Court to hear [the Objection] and decide it and decide how to structure the order" due to the fact that Regions had filed its Second Amended Claim so late in Ms. West's bankruptcy case. Ms. Madden asserted that Ms. Babin had said the same thing. Specifically, Ms. Madden testified, "I can't say that I know the Trustee agreed to [the settlement], ... but I was pretty sure ... that was something the Trustee could live with." When Ms. Babin asked Ms. Madden if she recalled Ms. Babin mentioning to her that she was bringing documents for a hearing on December 6, 2007, Ms. Madden replied, "[n]o ... I don't think we talked about documents." Because Ms. Madden had a personal obligation on the day of the hearing, she asked Mr. C. James Kubicek to stand in for her rather than ask the Court for a continuance. Ms. Madden explained, "I didn't realize [the Objection] was personal," and "[a]s far as I knew, I had a happy client."

Ms. Madden later testified at the OSC Hearing that she took Ms. West's file to Mr. Kubicek at 8:00 a.m. on the morning of the Objection Hearing and explained everything that she knew about Ms. West's file "at least twice." Ms. Madden testified that she

> told [Mr. Kubicek] that I had the matter worked out. I told him that ... Regions and [Ms. West] had agreed on the amount, and Regions and [Ms. West] had agreed upon a payment plan of a hundred a month, and that both Mr. Dyke and Ms. Babin wanted to have the

---

**12.** At first glance, it may be unclear who Ms. West is referring to when she says "we." However, Ms. West's consistent testimony is that she never understood her objection to be settled, and that she came to the hearing prepared to present her case. Accordingly, the Court finds Ms. West was referring to the settlement between herself and Mr. Dyke which was reached the day of the Objection Hearing.

Court to structure the order so that it would somehow be in the way that the Court would want the order to read, and that there wasn't really any issue remaining that I could see because I had already cleared it up with both Mr. Dyke and Ms. Babin and [Ms. West]. And everybody was in agreement on everything that needed to happen.

Ms. Madden concluded by saying that she told Mr. Kubicek that "there's still this little dangling issue of a couple hundred dollars" that could possibly be owed to Regions, but that otherwise, the Objection was settled.

Ms. Babin, on the other hand, testified that she did not believe the Objection had been resolved prior to the December 6, 2007 hearing. Ms. Babin based her statement that the case was not settled on her phone conversation with Ms. Madden on December 5, 2007, and also because she believed Ms. West was planning on appearing to address some of her concerns with the Court. In response to Ms. Madden's testimony that Ms. Babin wanted the Court to structure the order, Ms. Babin testified that she did not specifically recall telling Ms. Madden that she wanted the Court to do so.

The Court finds that Ms. West's Objection was not settled prior to the December 6, 2007 hearing.

### December 6, 2007 Objection Hearing

Ms. Madden sent Mr. Kubicek to the December 6, 2007 Objection Hearing to represent Ms. West. Mr. Dyke appeared on behalf of Regions. Ms. Babin also appeared. When the Court initially called the Objection for hearing, Ms. West stated to the Court, "[t]hey're not here." Ms. West made this statement because she believed that no one was there from the Madden Law Firm to represent her at the Objection Hearing. Mr. Kubicek responded, "[t]hat's not true, Your Honor. Jim Kubicek for the Madden Law Firm." After this exchange, the Court informed the parties that the Objection would be called back after other matters were heard.

When the hearing resumed, Ms. Babin announced that a settlement had been reached as to whether Ms. West owed Regions an arrearage. Ms. Babin stated that she, Ms. West, Mr. Dyke, and Mary Andrews, Ms. Babin's case manager, participated in the settlement negotiations. Ms. Babin further noted that Mr. Kubicek "listened in" to the settlement negotiations. Ms. Babin reported that Mr. Dyke, Regions' attorney, explained to Ms. West during the settlement negotiations how Regions was still owed a large arrearage. Ms. Babin further stated that Ms. West indicated that she understood how Mr. Dyke had calculated the arrearage amount. Ms. Babin informed the Court of the specific terms of the settlement, which provided for an arrearage of $3,667.47 to be paid to Regions outside Ms. West's bankruptcy plan by increasing her regular monthly mortgage payment by $100 per month. The Trustee also reported that she held $1,366.59 which would have been paid to Regions rather than unsecured creditors, but that Regions had agreed to allow the Trustee to refund these monies to Ms. West. This settlement between Ms. West, the Trustee, and Regions was documented shortly thereafter in an *Agreed Order Settling Objection to Claim Filed by Debtor Ethel T. West,* entered on December 20, 2007 (the **"Objection to Claim Agreed Order"**).

After this announcement, Ms. West explained why she believed that Ms. Madden and the Madden Law Firm had not adequately represented her in her bankruptcy case. Ms. West's testimony as to her specific complaints with respect to her representation throughout her bankruptcy case, upon receipt of the Status Letter, and

leading up to her filing of the Objection and the Objection Hearing have already been detailed in this Opinion.[13]   Ms. West concluded that her "biggest problem" was that she had paid Ms. Madden "almost $2,500.00 for maybe five conversations and no representation."   Ms. West noted that she had never seen Mr. Kubicek prior to the Objection Hearing and did not know who he was when he appeared at the podium announcing that he represented her.[14]   Ms. West felt that she had been "more or less" representing herself throughout her bankruptcy case, and testified, "[e]ach and every time I would contact the Madden Law Firm to ask them any questions, no one returned my phone calls."   Based on those complaints, Ms. West asked the Court if she could be refunded at least half of the money that she paid Ms. Madden because Ms. Madden and the Madden Law Firm had not adequately represented her.

Mr. Kubicek declined to cross-examine Ms. West, saying, "Your Honor, I have no questions of her.   I do not know her." Mr. Kubicek later explained that he was late for court due to parking problems, and had not yet met Ms. West. Mr. Kubicek then declined to testify, but spoke on behalf of the Madden Law Firm as its attorney.   Mr. Kubicek explained his relationship with the Madden Law Firm, stating that although he was a member of the Madden Law Firm, he was not allowed to practice bankruptcy law at the Madden Law Firm unless he was asked to cover when Ms. Madden or Mr. Jackson could not attend.   Mr. Kubicek stated that he

was compensated by the Madden Law Firm for his "stand in jobs."   The Court is taken aback that Ms. Madden would not allow Mr. Kubicek to practice bankruptcy law yet ask him to stand in for her and represent her clients in bankruptcy court.

Mr. Kubicek explained that Ms. Madden asked him to stand in for her on the day of the Objection Hearing.   In order to prepare for the Objection Hearing, Mr. Kubicek stated that Ms. Madden came to his office on December 5, 2007, to discuss the details of Ms. West's file.   Mr. Kubicek stated that Ms. Madden gave him the "whole file" to bring to the Objection Hearing, and he believed that Ms. Madden "apprize[d]" him "of the basic essence ... of the negotiations that had been taking place with Ms. Babin's office and Mr. Dyke with regard to trying to resolve this issue."

When the Court asked Mr. Kubicek if he read the materials relating to the Objection before coming to the Objection Hearing, Mr. Kubicek responded by saying, "[w]ell, sure.... I do not want to embarrass myself and come before any Court without being as prepared as I possibly can."   However, when the Court asked Mr. Kubicek if he was concerned about the allegations made by Ms. West in the Objection regarding inadequate representation by Ms. Madden and the Madden Law Firm, Mr. Kubicek admitted that he had not read the Objection itself and could not "respond to those allegations at all."   Mr. Kubicek added that he was not given a copy of the Objection despite the fact that the Objection was the pleading set for

---

13.   Because Ms. West appeared *pro se,* her testimony was not structured or strategically planned.   She provided a commentary of her experience as a client of Ms. Madden's without rancor or anger.

14.   Ms. West further testified at the OSC Hearing that Ms. Madden did not call her to let her know that someone else would be standing in

her place representing her law firm.   Ms. West stated that on the day of the Objection Hearing, "... I was in Court prepared to do what I had to do, and then to look around and have no representation was almost—it was frightening, you know, to look up and not—my lawyer not even be here."

hearing on December 6, 2007.[15] When the Court further pressed Mr. Kubicek as to why he had not read the Objection prior to the hearing, Mr. Kubicek directed the Court's attention to the thickness of Ms. West's file. Although Mr. Kubicek had not met Ms. West or read the Objection prior to the Objection Hearing, and although the Trustee described his representation as "listening in," Mr. Kubicek said that he felt prepared for the Objection Hearing.

### Ms. West's Motion to Disgorge

Shortly after the Objection Hearing, Ms. West formalized her oral motion for disgorgement made at the hearing, by filing a letter *pro se,* on December 19, 2007, in which she specifically requested that all of Ms. Madden's fees be disgorged (the "**Motion to Disgorge**"). Ms. West also alleged in the Motion to Disgorge that she had spoken to her lawyers since the Objection Hearing, and that Mr. Jackson asked her to sign papers saying that she understood what had happened in Court and stating that she was "happy" with how the Madden Law Firm had handled her case. Ms. West further alleged that she did not sign anything and was not happy with how the Madden Law Firm handled her case. With respect to these allegations, Ms. Madden confirmed at the OSC Hearing that Mr. Jackson asked Ms. West to come in following the Objection Hearing in order to understand her concerns. Ms. Madden adamantly testified that Ms. West "was never handed any document to sign." However, Ms. Madden did admit, "[i]t's my understanding that [Mr. Jackson] asked [Ms. West] if there was anything that she

could sign that said she was happy about anything at all. And as best as I can tell you, there was nothing that she was able to be happy about."

Ms. West specifically testified at the OSC Hearing that Mr. Jackson asked her to come to the Madden Law Firm on December 12, 2007, to discuss her case. Ms. West testified that Mr. Jackson apologized for the problems that arose in Ms. West's case, but told her that she "owed the money and Regions didn't follow through." Ms. West testified that she agreed that she owed the money to Regions, but she testified that she told Mr. Jackson, " '... the Regions lawyer took ten minutes to sit down and explain to me why I owed the money. Why couldn't you have done that?' " Ms. West testified that following this exchange between her and Mr. Jackson, Mr. Jackson went to find Ms. Madden.

Ms. West testified that when Ms. Madden entered the room, she told Ms. West that "she did everything possible, that she thought she had served me to her best, and that she was sorry that I wasn't satisfied." After this statement, Ms. West testified:

> [Mr. Jackson] ... ask[ed] me would I be willing to sign papers saying that I was satisfied with the way the Madden Law Firm had handled my case. And I told him no, because I wasn't satisfied and that ... I wasn't going to sit up and lie and say that I was, when I wasn't. I told him that he was—had been very nice to me, ..., whenever I was in his presence, and ... I appreciate that.

---

**15.** Ms. Madden later testified at the OSC Hearing that a copy of the Objection was in Ms. West's file, but because the Objection was not titled *Objection to Allowance of Claim,* she understood how Mr. Kubicek "got a little confused about whether he'd seen it or not." The Court notes that in another case (4:03–

bk–19761), Ms. Madden sent Mr. Kubicek to a Court hearing unfamiliar with the debtor's bankruptcy case, which resulted in an Order to Show Cause. At the hearing, the Court found Ms. Madden's explanation sufficient, and no action was taken.

But other than that, signing papers saying that I was satisfied with how I was represented, I wasn't going to do it.

The Court finds that Ms. West was asked to meet with Mr. Jackson for the purpose of confirming that she was satisfied with her representation but that she declined to do so either verbally or in writing because she remained convinced that the representation was inadequate.

### The Order to Show Cause and January 29, 2008 OSC Hearing

The Court's Order to Show Cause entered on January 4, 2008, and Ms. West's Motion to Disgorge were heard on January 29, 2008. At the OSC Hearing, the Court began by stating that it was holding the OSC Hearing in order to give Ms. Madden another opportunity to address Ms. West's allegations against her. After the Court heard opening arguments, Ms. Madden, Ms. Babin, and Ms. West gave testimony, most of which was previously described in this Opinion. Ms. West testified under oath at the OSC Hearing without assistance from an attorney.

Ms. Madden testified as to the following facts, beginning with her workload and how many bankruptcy cases she handles at any given time. Specifically, she testified that she had on her "to do stack … maybe four or five hundred files at all times with things that need to get done." Ms. Madden explained that while she is the sole principal of the Madden Law Firm, she has one employee, Bradford Carter Nye, who almost exclusively handles bankruptcy cases along with her. Before his resignation, Mr. John Jackson helped Ms. Madden with bankruptcy cases. Mr. Kubicek and another attorney, C. Richard Crockett, work for the Madden Law Firm but mostly handle their own non-bankruptcy cases. Ms. Madden testified that both she and Mr. Jackson worked on Ms. West's bankruptcy case, although she did not recall Mr. Jackson having worked with Ms. West until the problem with the Regions arrearage arose in September 2007.

Additionally, in reference to Ms. West's allegations in her Motion to Disgorge that the Madden Law Firm never provided her with an explanation as to how she could owe Regions an arrearage, Ms. Madden testified at the OSC Hearing that Mr. Jackson provided Ms. West with an explanation during their November 13, 2007 phone conversation, that she provided Ms. West with an explanation during their September 20, 2007 phone conversation, and that she provided Ms. West with a written explanation in the November Letter. Ms. Madden concluded by testifying that "[t]here may have been more, but there were at least three [explanations] for certain." While Ms. West acknowledged receiving the November Letter, she did not confirm that there was a September 20, 2007 phone conversation, and testified that the November 13, 2007 phone conversation was only to notify her of a continuance. Ms. Madden provided no documentary evidence of either the September 20, 2007, or November 13, 2007 phone conversations.

Ms. West testified that prior to the Objection Hearing, she believed that she was paying the arrearages owed to Regions the whole time. She said, "[n]o one ever contacted me … that Regions didn't come through and finish modifying the plan or filing whatever they [were] supposed to." She also stated:

I felt that I wasn't represented fairly through Ms. Madden's law firm. And the reason why I say that was because of the many times I tried to contact her office on questions that I had about particular things and I couldn't get [an] answer, a return phone call, or I wasn't

allowed to come in to talk with her about any questions or paperwork that I had. Ms. West also specifically addressed the conversations and communications that Ms. Madden alleged took place between herself and Ms. West. Ms. West testified that as of January 29, 2008, she thought she had three conversations with Ms. Madden, and one of those was December 12, 2007, the day Ms. West was asked to sign the paperwork saying she was happy with the law firm. Ms. West testified, "... I don't have any reason to lie on Ms. Madden about making phone calls and conversations with her, but I didn't have any." Ms. West further testified that "a lot of the things that [Ms. Madden] said and conversations she said we had, we didn't have." Moreover, Ms. West testified that she "kept every piece of paper ever sent to me by anyone concerning my case. So that's why I know when she said I was notified or I was sent the letter saying this, I wasn't." In explaining why she wanted Ms. Madden to return all fees paid, Ms. West said, "if you enlist yourself to do a job, at least do it, keep the lines of communication open and don't over book yourself where you cannot keep an open mind or to let your clients know what's going on."

The Court finds credible Ms. West's testimony that the November 13, 2007 phone call was to inform her that the hearing had been continued, and that Mr. Jackson did not explain to Ms. West the proposed settlement with Regions. Further, both Ms. West's testimony and Ms. Madden's testimony regarding the November 13, 2007 phone call supports this Court's finding that there was no September 20, 2007

phone call in which Ms. West agreed to a settlement with Regions. Had Ms. Madden made that phone call as she alleged, there would have been no need for Ms. West to call the Court to ask for more time at the Objection Hearing, and no need for Mr. Jackson to explain the same proposed settlement to her again on November 13, 2007.

### Ms. Madden's Fee Applications

On December 2, 2002, Ms. Madden filed an *Application for Attorney's Fees,* in which she requested $1,290.00 in attorney's fees and costs for the routine services that she would perform for Ms. West through confirmation of Ms. West's Initial Chapter 13 Plan. In an Order entered on January 14, 2003, the Trustee approved a payment of $1,053.00 of the $1,290.00 that was requested. On July 27, 2005, Ms. Madden submitted an *Application for Allowance of Fees and Expenses* (the "**Post–Confirmation Application**") for the services that the Madden Law Firm had rendered to Ms. West since the confirmation of Ms. West's Chapter 13 plan in June 2003. The total amount requested in attorney's fees and costs in the Post–Confirmation Application was $1,495.97. On July 27, 2005, Ms. Madden submitted an *Application for Pre–Confirmation Costs* to cover the $22.00 cost of noticing two pre-confirmation plan modifications, which was approved by an Order entered September 30, 2005. On December 22, 2005, the Trustee entered an Order approving a payment of only $1,061.91 instead of the $1,495.97 requested by Ms. Madden.[16]

At the Objection Hearing, Ms. West stated that she disagreed with $840.00 in

---

**16.** According to the *Accounting of Attorney's Fees Paid to Madden Law Firm,* introduced as Trustee's Exhibit 1, the Trustee's office actually paid Ms. Madden $1,116.91 pursuant to the Order Approving Post–Confirmation Application. Because Ms. Madden was only owed

$1,061.91, Ms. Madden received an overpayment of $55.00 from the Trustee's office. Based on testimony from Ms. Babin at the OSC Hearing, Ms. Madden has agreed to return the extra $55.00.

attorney's fees that were requested by Ms. Madden in the Post–Confirmation Application. In the Post–Confirmation Application, Ms. Madden requested .1 hours in attorney's fees for a telephone conference that occurred on February 9, 2004, between "Client and J. [Benton] Dyke," .2 hours in attorney's fees for a telephone conference that occurred on April 26, 2004, between "Client and M. Riable," and .1 hours in attorney's fees for a telephone conference that occurred on July 14, 2005, between "Client–Hospital." Ms. West claimed that "there was no telephone conferences like they had billed." Ms. West said:

> And I told them that most of the things that they had put on here wasn't true; I hadn't spoken with anybody, there was no telephone conferences like they had billed and said, and that I didn't agree with the payments or I didn't agree with the documents they had sent asking for additional attorney fees. Well, they got it anyway even though no one ever returns any phone calls.

Regarding Ms. West's allegation that she told the Madden Law Firm that most of the things itemized in the Post–Confirmation Application were not true, Ms. Madden explained at the OSC Hearing that she "didn't actually itemize it by hand, but ... I had staff go through the file and do that." Ms. Madden further testified that to the best of her knowledge, she undertook every activity that was itemized in the Post–Confirmation Application. Ms. Madden also testified that her records (and "personal recollection") did not reflect that Ms. West made any objection to the Madden Law Firm's fee application, formally or informally, at the time the Post–Confirmation Application was filed or granted by the Court.

At the OSC Hearing, Ms. West again claimed that Ms. Madden billed her for three (February 9, 2004, April 26, 2004, and July 14, 2005) conversations between herself, Ms. Madden, and other parties which did not occur. Ms. West was sure that she never had a three way conversation with Ms. Madden, or anyone else from the Madden Law Firm. The Court finds Ms. West's testimony credible, and that she was billed for services not rendered by Ms. Madden.

### Posture of Ms. West's Bankruptcy Case at Discharge

On the day Ms. West signed her bankruptcy petition, she was current on her mortgage and owed approximately $5,000 in unsecured debt. After making 60 full and timely plan payments as required in her plan, in addition to paying approximately $2,200.00 in attorney's fees to Ms. Madden, $500.00 in attorney's fees to Regions, $1,500.00 in Trustee's fees, and a $185.00 filing fee, Ms. West discharged her unsecured debts and paid off her vehicle (but at a larger amount and interest rate which she did not agree to), but leaves bankruptcy with outstanding arrearages on her home mortgage of $3,667.47, which she is obligated to pay to Regions at $100.00 per month in addition to her regular monthly mortgage payment.

### DISCUSSION

▬ The Court has the power to order the return of attorney's fees under 11 U.S.C. § § 105 and 329, and Federal Rule of Bankruptcy Procedure 2017. *See In re Zepecki,* 258 B.R. 719 (8th Cir. BAP 2001). Section 329 provides, in part,

> (a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year be-

fore the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

**(b)** If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive. . . .

"To determine whether fees are excessive, a court should compare the amount of compensation that the attorney received to the reasonable value of the services rendered." *See In re Zepecki,* 258 B.R. 719 (8th Cir. BAP 2001) (*citing In re Redding,* 247 B.R. 474, 478 (8th Cir. BAP 2000)). "An attorney has the burden of proof to establish that any compensation which he has received is reasonable." *Matter of Olen,* 15 B.R. 750 (Bankr.Mich.1981). *See also In re Mills,* 170 B.R. 404 (Bankr. D.Ariz.1994); *In re Rheuban,* 121 B.R. 368 (Bankr.C.D.Cal.1990). This Court finds that all transactions between the debtor and the attorney, including the services rendered by the attorney, are relevant to determine the reasonableness of compensation. Therefore, if all of the services rendered by the attorney do not warrant the compensation provided, the Court may order the return of the compensation as excessive.

■ As stated in the Order to Show Cause, the Court finds that the allegations made by Ms. West against Ms. Madden in her Objection, her Motion to Disgorge, and her testimony at the Objection Hearing raise concerns about whether Ms. West was adequately represented by the Madden Law Firm, whether the Madden Law Firm charged Ms. West for services not rendered, and whether the Madden Law Firm failed to communicate with Ms. West. Further, the Court had concerns about Ms. West's representation by Ms.

Madden in that Mr. Kubicek appeared on Ms. West's behalf at the Objection Hearing unprepared. As explained in detail below, the Court finds that Ms. Madden and her firm did not adequately represent Ms. West, and all of Ms. Madden's attorney's fees should be disgorged.

When Ms. West, a single mother of two children, made the decision to hire Ms. Madden as her bankruptcy attorney, Ms. West entrusted Ms. Madden with her financial future and her only major asset, her home. At the time Ms. West signed her Initial Chapter 13 Plan on October 29, 2002, she was current on her mortgage to Regions, and therefore proposed to pay Regions outside the plan. However, from the time that Ms. West signed her Initial Chapter 13 Plan on October 29, 2002, until the time Ms. Madden filed the Petition on behalf of Ms. West on December 2, 2002, Ms. West fell slightly behind in her payments to Regions. This resulted in Regions filing the Original Claim on March 10, 2003, claiming that it was owed $1,183.31 in pre-petition arrearages, including $889.76 in monthly mortgage payments for the months of November 2002 and December 2002. If Ms. Madden had not waited over a full month to file the Petition on behalf of Ms. West or if Ms. Madden followed up with Ms. West to ensure that she was still current on her mortgage as of December 2, 2002, then Ms. West would not have been paying her mortgage outside the plan even though she was not current on her mortgage at the time she filed bankruptcy. However, upon receipt of Regions' Original Claim filed March 10, 2003, claiming this pre-petition arrearage, Ms. Madden took no action. She did not contact her client, she did not object to the claim, and she did not modify Ms. West's plan to pay this arrearage.

■ Ms. Madden also failed to adequately represent and communicate with

Ms. West regarding the Malco Objection. Shortly after Ms. West filed bankruptcy, Mr. Jackson called Ms. West about Malco's Objection. Although Ms. West proposed in her Initial Chapter 13 Plan to pay Malco the full value of its collateral, a 1997 Ford Taurus listed with a value of $6,500, at an interest rate of 9%, Mr. Jackson told Ms. West that Malco wanted more money in order to settle its objection. Ms. West informed Mr. Jackson that she did not want to settle the Malco Objection and did not want to pay Malco more than what was proposed in the plan. Ms. West testified that at the time she filed bankruptcy, she believed the blue book value for her 1997 Ford Taurus was only $5,000, and prior to filing bankruptcy, she had already paid Malco $2,000 for the Ford Taurus. Ms. West told Mr. Jackson that she preferred to surrender the Ford Taurus to Malco, rather than pay $9,000 for the car. At the time that Ms. West filed bankruptcy, "the appropriate measure of the value of the vehicle [was] the Blue Book retail value minus 5%." *In re Campbell*, 234 B.R. 101, 103 (Bankr.W.D.Mo.1999). Based on Ms. West's uncontradicted testimony concerning the value of her car and law which supports relying on this evidence to establish value, Ms. Madden should not have agreed to pay Malco $7,500 for the Ford Taurus on Ms. West's behalf. As a result of the Malco Agreed Order, Ms. West did not receive the full benefit provided by the Bankruptcy Code and case law with regard to her vehicle during the duration of her bankruptcy case. Further, although Ms. West had never missed a single plan payment to the Trustee,[17] Ms. Madden additionally agreed to subject Ms. West to nine months strict compliance.[18] After the entry of the Malco Agreed Order, neither Ms. Madden nor Mr. Jackson communicated with Ms. West about the settlement with Malco. Ms. West learned that Malco's objection was settled over her objection by mail. The Court finds that Ms. Madden settled Malco's Objection without authority, and further finds that the terms of settlement (specifically Ms. Madden's agreeing to strict compliance, 10% interest, and a $7,500 value) were not a legal or factual necessity and were not in Ms. West's best interests.

A little over a year into her bankruptcy, Ms. West began to fall behind in her mortgage payments to Regions. Prior to signing her petition, Ms. West was current on her mortgage. After filing bankruptcy, Ms. West exhibited discipline and stability in making every plan payment. Additionally, she always presented her problems to the Court logically and calmly. Choosing to reduce unsecured debt while incurring an arrearage on her home is not an eco-

---

**17.** It has been reported that only one in three Chapter 13 cases results in a discharge. *See* Scott F. Norbert & Andrew J. Velkey, *Debtor Discharge and Creditor Repayment in Chapter 13*, 39 Creighton L.Rev. 473, 505 & n. 70 (2006) ("The overall discharge rate for the debtors in the seven districts covered by the Project was exactly the oft-repeated statistic of one-third."); Gordon Bermant & Ed Flynn, *Measuring Projected Performance in Chapter 13; Comparisons Across the States*, 19 Am. Bankr.Inst. J. 22, 22 (July–Aug.2000); Henry E. Hildebrand, III, *Administering Chapter 13—At What Price?*, 13 Am. Bankr.Inst. J. 16, 16 (July–Aug.1994).

**18.** "Strict Compliance" means that the debtor must make every plan payment to the Trustee during the designated time period; if the debtor fails to make every plan payment during the designated time period, then the creditor may receive relief from the automatic stay as to the subject real or personal property after filing an Ex Parte Motion and submitting an Ex Parte Order. Strict compliance is rarely, if ever, agreed to as a settlement of an Objection to Confirmation of a Chapter 13 plan, and it is rarely agreed to with respect to any type of pleading when a debtor has not missed a single plan payment to the Trustee.

nomically nor logically sound decision. The evidence throughout the case supports the inference that Ms. Madden failed to explain to Ms. West the practical and significant implications of missing a mortgage payment and failed to counsel her client concerning possible alternative solutions when cashflow shortages occur. Due to Ms. West's falling behind on her mortgage payments post-petition, Regions filed its Motion for Relief claiming that Ms. West was due for her August 1, 2003 mortgage payment and subsequent payments. Pursuant to the Regions Agreed Order, Ms. West filed the March 2004 Modified Plan, providing for Regions to be paid inside the plan at a regular monthly mortgage payment of $426.34 and providing for Regions to be paid an arrearage of $3,894.26 (including $500 in attorneys fees) inside the plan to be cured at $109.00 per month. The March 2004 Modified Plan increased Ms. West's plan payments from $171.20 bi-weekly for the life of the plan to $394.41 bi-weekly for the life of the plan. When Regions followed up by filing its First Amended Claim, it failed to include the $3,394.26 post-petition arrearage provided for in the Regions Agreed Order, and instead only added the $500 attorneys fees to its Original Claim of $1,183.31.

■ Then, just a few months after filing the March 2004 Modified Plan, Ms. West explained to Mr. Jackson that because she was no longer receiving child support, she needed a lower plan payment. Mr. Jackson advised her that she could reduce her plan payments due to the change in her income. Based on Mr. Jackson's advice, Ms. West agreed to file the September 2004 Modified Plan, reducing her plan payments from $394.41 bi-weekly for the life of the plan to $329.79 bi-weekly for the life of the plan. Although unknown to Ms.

West, when she agreed to the terms of the September 2004 Modified Plan to lower her plan payments, she agreed to an underfunded plan. With the filing of the September 2004 Modified Plan, Ms. West was no longer paying sufficient funds to the Trustee with which the Trustee could pay Regions the $3,894.26 in arrearages previously provided for in the March 2004 Modified Plan. Rather, Ms. West was only paying Regions through her plan the $1,183.31 in arrearages claimed by Regions in its Original Claim plus the $500 attorneys fees provided for in Regions' First Amended Claim. Consequently, when Regions filed its Second Amended Claim on September 6, 2007, which included the $1,183.31 in pre-petition arrearages from Regions' Original Claim and the $3,894.26 in post-petition arrearages provided for in the Regions Agreed Order, Ms. West did not have the extra funds in her plan to pay Regions, and did not have enough time left in her plan to make up the arrearage. Ms. Madden's and Mr. Jackson's legal advice (or lack thereof) placed Ms. West in a position where despite having made every plan payment in full and on time for sixty months, she still owed over $3,500.00 in arrearages on her home mortgage at the end of her bankruptcy plan—had Ms. West not objected, she could have lost her home to foreclosure upon the entry of discharge in her case.[19] In sum, the Court concludes that neither Ms. Madden nor Mr. Jackson counseled Ms. West regarding the consequences of lowering her plan payment in September 2004.

Ms. Madden waited several years before she finally informed Ms. West in the November Letter as to why it was permissible to reduce Ms. West's Chapter 13 plan payments in September 2004 (because Regions had not yet filed its Second Amend-

---

19. Once a debtor receives a discharge, there is no longer an automatic stay protecting the debtor from foreclosure. See 11 U.S.C. § 362(c)(2).

ed Claim, Ms. West could as of September 2, 2004, calculate her plan payments based on Regions' First Amended Claim). Further, Ms. Madden's statement in the November Letter that the September 2004 Modified Plan was filed "at [Ms. West's] request" does not negate Ms. Madden's responsibilities as Ms. West's counselor, but further illustrates that Ms. Madden did not provide Ms. West with competent or diligent representation. When Mr. Jackson advised Ms. West that it was permissible to lower her plan payment, all the information he needed to advise her was in her file, the ECF docket or the claims register. Had he conducted such a review, he would have seen both the Regions Agreed Order and the March 2004 Modified Plan providing for the payment of post-petition arrearages to Regions. He would have also seen that Regions never filed an amended proof of claim in accordance with the Regions Agreed Order. However, neither Mr. Jackson nor Ms. Madden conducted such a review, and therefore did not provide competent counsel to Ms. West.

Ms. West also asserts that Ms. Madden billed her for services not rendered. On July 27, 2005, Ms. West received a copy of Ms. Madden's Post–Confirmation Application in which Ms. Madden requested .1 hours in attorney's fees for a telephone conference that she had on February 9, 2004, with "Client and J. Dyke," .2 hours in attorney's fees for a telephone conference that she had on April 26, 2004, with "Client and M. Riable," and .1 hours in attorney's fees for a telephone conference that she had on July 14, 2005, with "Client–Hospital." Upon receipt of the Post–Confirmation Application, Ms. West contacted the Madden Law Firm in order to inform the Madden Law Firm that she never had a three-way conversation with Ms. Madden or any other individual from the Madden Law Firm and to object to the attorney's fees requested in the Post–Confirmation Application. However, Ms. West testified that her phone calls were not returned.

At the OSC Hearing, Ms. Madden explained that she did not personally prepare the Post–Confirmation Application; rather, her staff prepared the itemized Post–Confirmation Application by going through Ms. West's file. If Ms. Madden's staff was able to itemize the Post–Confirmation Application by going through Ms. West's file, then Ms. Madden should have been able to introduce documentary evidence from Ms. West's file, which both prompted the billing for and verified these three-way conversations with Ms. West. Ms. Madden introduced no such evidence at the OSC Hearing. Ms. Madden did not testify that she actually made these telephone calls; rather, she testified that there was an office routine without providing evidence that the routine was followed. Ms. West testified that she was not included in any three-way conversations. All other related evidence concerning settlements with either Malco or Regions, support a finding that these three-way conversations involving Ms. West did not occur, and that Ms. Madden billed for what she should have done (communicated with Ms. West), rather than what she actually did. The Court finds that there were no three-way conversations involving Ms. West, and therefore, Ms. Madden billed for services not rendered. Further, these inaccuracies place the other entries into question as well.

While the Madden Law Firm's communication with Ms. West had already been poor, communication completely broke down near the completion of Ms. West's plan in Fall 2007, after Ms. West received the Trustee's Status Letter informing her that she still owed Regions a $4,511.80 arrearage. Because Ms. West was never made aware that upon filing the Septem-

ber 2004 Modified Plan, she was no longer paying Regions the $3,894.26 in arrearages previously provided for in the March 2004 Modified Plan, Ms. West clearly and understandably believed that she had already paid all of the arrearages owed to Regions through her plan. Furthermore, Ms. West firmly believed that she could not owe Regions a $4,511.80 arrearage because she had never missed a Chapter 13 plan payment. With only four months left in her plan, Ms. West became extremely anxious to get the problem resolved with Regions.

Ms. West immediately contacted the Madden Law Firm upon receipt of the Status Letter in hopes that her attorney, Ms. Madden, would be able to resolve the problem with Regions. She continued to call the Madden Law Firm just about every day, but neither Ms. Madden nor Mr. Jackson returned her calls. Ms. West even went to the Madden Law Firm, but neither Ms. Madden nor Mr. Jackson would see her. On one occasion, Madden Law Firm personnel, who were authorized to take messages from and communicate with clients, advised Ms. West to represent herself, instructing her to contact the Trustee's office because the Trustee made the payments to creditors. It was not until Ms. West threatened to write the Court about how the Madden Law Firm had treated her that she was finally allowed to speak to Mr. Jackson regarding the Status Letter. On September 13, 2007, Mr. Jackson told Ms. West that he would call her back at the end of the day to provide Ms. West with an explanation as to how she could possibly owe Regions a $4,511.80 arrearage. Unfortunately, Mr. Jackson did not call Ms. West back until a full month later.

When Ms. West did not hear from Mr. Jackson, she again tried to reach him by phone on both September 18, 2007, and September 19, 2007. Once again, Ms.

West's phone calls were left unreturned. Had Ms. Madden explained the proposed settlement to Ms. West on September 20, 2007, as she testified, Ms. West would not have filed her *pro se* objection in October. Ms. West testified that she filed the Objection because she refused to pay Regions an additional $4,511.80 without an explanation as to why she owed it. From the time Ms. West received the Status Letter, Ms. West wanted only one thing from Ms. Madden: an explanation as to why she owed Regions a $4,511.80 arrearage. Ms. Madden testified that Ms. West was provided an explanation during the alleged September 20, 2007 phone conversation, in the November 13, 2007 phone conversation between Ms. West and Mr. Jackson, and in the November Letter. However, the November Letter made no mention of Regions' failure to properly amend its claim following the entry of the Regions Agreed Order, which is essential to explaining why Ms. West still owed Regions $4,511.80. In contrast to Ms. Madden's testimony, Ms. West confirmed that she had a phone conversation with Mr. Jackson on November 13, 2007, but testified that when Mr. Jackson spoke to her, he only informed her of the continuance of the hearing on her Objection. Ms. West also confirmed that she received the November Letter; however, Ms. West continuously and persistently stated and acted as if she never received an explanation from Ms. Madden or Mr. Jackson as to why she owed Regions a $4,511.80 arrearage. As stated by Ms. West, neither Ms. Madden nor Mr. Jackson could accomplish what Mr. Dyke accomplished in "only ten short minutes" on the morning of the Objection Hearing.

At the OSC Hearing, Ms. Madden gave the impression that upon receipt of the Status Letter, she did not "understand" how Ms. West could owe Regions such a large arrearage. In fact, she testified that she and Mr. Jackson began to investigate

by calling the Trustee's office and e-mailing Regions' counsel. However, it is of profound importance that when the Trustee sent the Status Letter to Ms. West and Ms. Madden, all the information Ms. Madden needed to understand and to provide Ms. West with an explanation was available in her file, the ECF docket, and the claims register, just as it was when Mr. Jackson informed Ms. West that she could lower her plan payment in September 2004. While Ms. West was cross-examining Ms. Madden, Ms. West placed a copy of the March 2004 Modified Plan in front of Ms. Madden, which provided for Regions to be paid an arrearage of $3,894.26 inside the plan to be cured at $109.00 per month. When Ms. West explained to Ms. Madden that she believed that the March 2004 Modified Plan meant that Ms. West was already paying Regions an arrearage of $3,894.26 at $109.00 per month, Ms. Madden responded by saying, "Yes, ma'am. I thought you were too." The Court finds that this testimony either contradicts Ms. Madden's statements in the November Letter, or indicates that Ms. Madden may have not realized until she wrote the November Letter that Regions failed to file the claim necessary to have its post-petition arrearage paid through Ms. West's plan. (In the November Letter, Ms. Madden stated that because Regions had not yet filed its Second Amended Claim, Ms. West could, as of September 2, 2004, calculate her plan payments based on Regions' Original Claim.) Having filed the September 2004 Modified Plan lowering Ms. West's plan payments and thereby creating an underfunded plan, the Court finds that Ms. Madden knew or should have known that the filing of the September 2004 Modified Plan meant that Ms. West would no longer be paying Regions the $3,394.26 in arrearages previously provided for in the March 2004 Modified Plan, but failed to communicate this to Ms. West. The Court concludes, given all the evidence, that Ms. Madden did not explain to Ms. West that if she did not continue making the full payments under the terms of the March 2004 Modified Plan, then at the conclusion of her 60 month plan when the discharge was entered and the stay lifted, Ms. West would still owe the post-petition arrearage on her mortgage, and that this arrearage would provide Regions the contractual right to begin foreclosure proceedings on her home.

In addition to sending Ms. West the November Letter, Ms. Madden did take other action to try to resolve the problem with Regions, but it was not enough to fully resolve the problem prior to the Objection Hearing. The evidence supports Ms. West's version of the events leading up to the hearing, that without an adequate explanation as to why she owed Regions a $4,511.80 arrearage, Ms. West would not give Ms. Madden permission to settle the Objection prior to the Objection Hearing. The last communication that Ms. West received from Ms. Madden prior to the Objection Hearing was the November Letter, in which Ms. Madden stated, "I need to know if you will agree to cure the remaining corrected arrearage after the case closes." When Ms. Madden did not receive a response to the November Letter from Ms. West, she should have understood that Ms. West did not want to settle the Objection with Regions and planned to attend the Objection Hearing. Even if Ms. Madden did not come to this logical conclusion, she easily could have picked up the phone and called Ms. West prior to the Objection Hearing to ascertain her client's position on the upcoming hearing.

Ms. West was not alone in her belief that the Objection was not settled. Neither Mr. Dyke nor Ms. Babin believed that the Objection had been settled prior to the Objection Hearing. Ms. Madden testified

that Mr. Dyke preferred "the Court to hear [the Objection] and decide it and decide how to structure the order." Ms. Babin testified that it was her "understanding ... that the ... Objection had not been resolved" and that Ms. West "was going to appear because she had some concerns that she wanted addressed on that date." Even Ms. Madden had prepared some exhibits for the Objection Hearing. Based on the testimony, the Court finds that the Objection was not settled prior to the Objection Hearing.

Further evidencing the Madden Law Firm's failure to communicate with Ms. West, Ms. Madden sent a substitute to Court on the morning of December 6, 2007, without informing Ms. West that she was doing so. Ms. West appeared in Court prepared to explain why she did not owe Regions a $4,511.80 arrearage. When the Court initially called the Objection for hearing on the morning of December 6, 2007, Ms. West responded "[t]hey're not here," referring to her attorneys. Ms. West had no idea that the man at the podium, whom she had never met nor spoken to, was her attorney, Mr. Kubicek. Ms. West thought she was going to have to represent herself at a hearing concerning a large arrearage claim on her home mortgage because Ms. Madden failed to inform her that she would not be present on the day of the Objection Hearing, and Mr. Kubicek did not introduce himself to her prior to the Objection Hearing. Mr. Kubicek blamed his inability to introduce himself on parking, a delay easily expected and avoided. Moreover, although Ms. Madden sent Mr. Kubicek to represent Ms. West at the Objection Hearing,[20] Mr. Kubicek was unprepared to represent Ms. West. Although he testified to a certain level of preparation, he acknowledged he

had not read the pleading set for hearing that day. Further, Mr. Kubicek did not participate in the settlement negotiations that took place on the morning of the Objection Hearing, and according to Ms. Babin's statement at the Objection Hearing, Mr. Kubicek merely "listened in." At the Objection Hearing, Ms. West had the sole responsibility to choose: either accept Mr. Dyke's explanation as to why she owed Regions a $4,511.80 arrearage (and Regions' reasonable settlement offer) or depend on an unknown and unprepared attorney to try her case. Ms. West chose to go with the former.

The evidence reveals that Ms. Madden did not provide Ms. West with adequate communication regarding her case; communication was sporadic at best, and where it was attempted, was not effective. Ms. Madden and her law firm did not return Ms. West's calls in a timely fashion if at all; instructed her to represent herself and call the Trustee's office for information; did not explain to her the basis for the large arrearage owed to Regions at the end of her case; did not explain the proposed settlement with Regions; and did not inform Ms. West that a stand in attorney would represent her at the Objection Hearing.

## CONCLUSION

Throughout Ms. West's bankruptcy, Ms. Madden failed to adequately represent her client, billed for services not rendered, and failed to communicate with her client. Specifically, Ms. Madden filed Ms. West's bankruptcy petition two months after it was signed, creating a situation where Ms. West became late on her mortgage payments while paying them outside her plan; failed to modify Ms. West's plan to pay Regions its pre-petition ar-

---

**20.** As explained in the facts, Mr. Kubicek stated that he was not allowed to practice bankruptcy law but was compensated by the Madden Law Firm for his "stand in jobs."

rearage after Regions filed its Original Proof of Claim; consented to the Malco settlement without Ms. West's permission in a way that negatively impacted Ms. West; failed to adequately counsel Ms. West on the consequences of reducing her plan payment after Regions failed to file a proof of claim for its post-petition arrearages, which resulted in an underfunded plan; billed for services not performed; forced Ms. West (through inaction) to represent herself by filing the Objection; failed to return Ms. West's phone calls; failed to explain to Ms. West why she owed Regions a $4,511.80 arrearage; failed to explain a proposed settlement with Regions; and left Ms. West virtually unrepresented at the Objection Hearing. In the end, Ms. Madden's legal advice (or lack thereof) prevented Ms. West from curing all of the arrearages owed to Regions by the end of her plan despite Ms. West fulfilling all of her obligations under her plan.

Comparing the benefits and the detriments of Ms. West's Chapter 13 bankruptcy, under any reasonable standard, leads to the conclusion that Ms. West was financially better off before she filed bankruptcy, than she was five years later. Even though she discharged approximately $5,000 in unsecured debts, she simultaneously amassed a post-petition arrearage on her home mortgage of $3,667.47. Ms. West was not at risk of losing her home when she filed, but if she had not intervened on her own behalf at the end of 60 months of uninterrupted plan payments, her home would have been subject to foreclosure proceedings upon entry of her discharge. For these reasons, the Court finds that a total disgorgement of Ms. Madden's attorney's fees is warranted.

For the reasons set forth herein, it is hereby

**ORDERED** that Ms. West's Motion to Disgorge is **GRANTED;** and it is further

█ **ORDERED** that Ms. Madden shall disgorge and return to Ms. West [21] $2,114.91 in attorney's fees paid to her; it is further

**ORDERED** that Ms. Madden shall file a Certificate of Compliance with this Court within thirty (30) days of entry of this Order, averring that the fees have been paid pursuant to this Order. Failure to timely pay the fees and file the Certificate may be grounds for an Order to Show Cause why Ms. Madden should not be held in contempt of Court; and it is further

**ORDERED** that this Opinion will be forwarded to the Arkansas Supreme Court's Committee on Professional Conduct as a complaint against Ms. Madden.

**IT IS SO ORDERED.**

---

21. Pursuant to 11 U.S.C. § 329, the court may order that excessive attorneys' fees be returned, but such payment must be made to the trustee if the fees would have been property of the debtor's estate. The Court finds it is appropriate to allow Ms. West to receive the disgorged fees as her case has been fully administered, and according to the Trustee, Regions was the only remaining creditor to receive estate funds, and Regions already agreed to allow the Debtor to receive all remaining funds held by the Trustee at the time of the Objection Hearing. Additionally, a review of the ECF docket reveals that Ms. West's unsecured creditors never filed claims in her bankruptcy case, and these unsecured claims as listed on Ms. West's schedules were discharged by the Order of Discharge entered in this case.